Opinion delivered March 23, 1889.

No. 2554.

JIM McCOY *v.* THE STATE.

1. PRACTICE—CHANGE OF VENUE.—The trial judge, of his own motion, changed the venue of this case from L. to B. county, the said B. county not being within the same judicial district. The objection urged by the defense was that the venue was changed to a county in another judicial district, and not to F., the nearest county in the same district. But among the reasons assigned by the judge for changing the venue to B. county instead of F. county, it appears that to his knowledge the said F. county was subject to the same objection as L. county. *Held,* that the venue was properly changed to B. county.

2. SAME—EVIDENCE.—A State's witness was permitted to testify that, about two or three weeks before the homicide, the defendant, in the presence of the witness and others, said that if the deceased ever came to Twohig he had better come shooting or he would not leave there alive. The objection urged was that the evidence did not tend to show the complicity of the defendant as a principal actor in the homicide, nor to establish a conspiracy with C., who was the actual perpetrator, to kill the deceased. *Held,* that the proof showing defendant to have been present at the homicide, the evidence was properly admitted in corroboration of attending circumstances evidencing not only a conspiracy to murder the deceased, but that the defendant and C. acted in concert in the perpetration of the murder.

SAME—CROSS EXAMINATION.—It is a general rule that a witness can not avoid answering a question that is material to the issue, upon the

ground that it imputes disgrace to himself, unless such disgrace amounts to crimination. Under this rule the trial court did not err in refusing to permit the defense, upon cross examination, to ask a State's witness if he did not, upon the trial of one W., for rape, endeavor to get the defendant to procure false testimony against W., such proposed evidence being material to no issue in this case.

4. MURDER—CHARGE OF THE COURT.—Omission or refusal of the trial court to submit in charge to the jury the law of murder in the second degree, when the evidence establishes only the higher grade, is not error.

5. SAME—PRACTICE IN THE COURT OF APPEALS.—The appellate court, in determining the question whether injury or probable injury resulted to the accused from the giving of an erroneous, or the omission of a necessary, instruction, must consider the charge in its entirety and as applied to the evidence embodied in the statement of facts.

6. SAME—CHARGE OF THE COURT.—In this case the general charge of the court clearly and concisely hinged the guilt of the accused upon the question whether he was present when C. killed the deceased, and, knowing the unlawful intent of C., aided or encouraged C. in the killing of the deceased; or whether he advised or agreed to the killing of the deceased by C., and was present when C. killed the deceased. The defense requested an alternative charge based upon the theory that C., unaided in any manner by the accused, shot and killed deceased, and that the shooting of one E., at the same time and place by the accused, was a distinct and separate transaction from the killing of the deceased by C. The trial court gave the requested instruction with the following qualification: "The foregoing charge is given in subordination to the general charge regarding principals." This qualification was not excepted to, but was urged as cause for new trial, and is relied upon in this court for reversal, the defense maintaining that, if the evidence does not clearly establish its theory, it leaves it in doubt, and that its said theory should have been submitted to the jury affirmatively, subordinate to no other charge and untrammeled by any qualification whatever. *Held*, that abstractly the objection is sound, and if based upon sufficient evidence or opposed by insufficient inculpatory proof, would require a reversal of the conviction; but, the evidence not only refuting the theory, but establishing beyond peradventure the propositions propounded by the general charge, the qualification appended to the special charge by the trial judge did not inure to the injury of the defendant.

8. MURDER—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

### ON MOTION FOR REHEARING.

9. PRACTICE—EVIDENCE—POSTPONEMENT FOR SURPRISE.—The motion for rehearing shows to the satisfaction of this court that, by reason of a clerical error in a bill of exceptions, the original opinion states that the witness E. testified that the threats of the deceased were to be executed at Cotulla, whereas in fact the said witness testified that Twohig

was the place whereat, in the event of the deceased going there, the threats would be executed. But *held* that, notwithstanding this showing, the motion for rehearing must be denied, because, in the light of the evidence on the trial, the absent testimony, if adduced, could not have affected the result of the trial.

Appeal from the District Court of Bexar, on change of venue from the District Court of La Salle. Tried below before the Hon. G. H. Noonan.

The indictment in this case was filed in the district court of La Salle county, on the tenth day of May, 1887. It charged the appellant with the murder of C. B. McKinney, in the said La Salle county, on the twenty-sixth day of December, 1886. On the thirteenth day of May, 1887, the appellant was arraigned in the district court of La Salle county, when the trial judge, of his own motion, changed the venue of the case to Bexar county. At the June term, 1888, of the district court of Bexar county, the appellant was placed upon trial, was convicted of murder of the first degree and awarded the death penalty.

S. V. Edwards was the first witness for the State. He testified, in substance, that in December, 1886, he occupied the offices of deputy United States marshal, deputy sheriff of La Salle county, and deputy hide and animal inspector of the same county. Captain C. B. McKinney, the deceased, was then the sheriff of La Salle county, and had occupied that office two terms. The witness had known the defendant since 1874 or 1875. The witness and deceased lived in Cotulla, La Salle county. On the twenty-sixth day of December, 1886, the deceased sent for the witness to go with him to Mrs. White's ranch, about six miles east from the town of Twohig, in La Salle county, for the purpose of arresting one Dow White on a charge of raping the daughter of a Mrs. Gallaway. The witness reported to the deceased and they left Cotulla on the two o'clock p. m., train, for Twohig. Before leaving Cotulla the witness and deceased were joined by Dr. Bain, who was going to Mrs. Gallaway's house for the purpose of making a medical examination of the alleged ravished girl. They arrived at Twohig between four and five o'clock in the evening. The defendant lived between three and four hundred yards east from the railroad depot at Twohig station. Witness saw the defendant in Twohig as soon as he got there, and a few minutes later

the defendant was joined by Bud Crenshaw, in front of Bain's store, where they held a short conversation. Defendant then met witness, and, after a few words of friendly conversation, asked what he and the deceased had come to Twohig for. Witness replied in a joking manner: "Ask me no questions, and I will tell you no lies." A few minutes later the defendant and Crenshaw started off together towards the defendant's house—both being on horseback. They passed deceased and witness about the railroad crossing, and when they had gone about twenty steps, Crenshaw turned and started back towards deceased. He had retraced his steps about half way when defendant said to him: "Come on, Bud." Crenshaw motioned his hand behind him at defendant, and went up to deceased and said to him: "How are you, Charley?" Deceased replied: "How are you, Bud?" Deceased and Crenshaw then shook hands, and deceased asked Crenshaw how he had passed Christmas. Crenshaw replied that he had had "a fine time, got drunk, but was sober now." They then told each other good bye, and Crenshaw rode off and overtook defendant. Deceased was in conversation with W. A. Stewart when accosted by Crenshaw. Witness and deceased got horses at Twohig, and employed Benito Santos to guide them to White's ranch.

Of the two routes which led from Twohig to White's ranch, witness and the deceased took the more easterly one, which passed by the defendant's house. When they reached a point within fifty or sixty yards of the defendant's house, they saw the defendant and Crenshaw on the west side of the house, near the door. They had apparently just emerged from the house at that door, and they almost immediately disappeared around the south side of the house. The witness next saw them as he and deceeased approached the east side of the house. They were then sitting or squatting down, facing the path or trail along which witness and deceased were riding. There was a blanket spread under them, and a pillow on the blanket. Defendant was sitting flat on either the blanket or pillow, and two six-shooter pistols lay on the blanket, one on each side of him. Defendant and Crenshaw each had a Winchester rifle in hand, with the muzzles pointing across the road in the direction that witness and deceased were to travel. Upon reaching a point near the said parties, deceased directed Dr. Bain and Santos to ride on ahead, to be overtaken presently by him and witness. Bain and Santos rode on and witness and deceased stopped, when

deceased called to Crenshaw: "Bud, I want to see you a few minutes." and rode off thirty or forty steps, leaving witness with or very near the defendant. Crenshaw got up, cocked his gun, and then let the hammer down and approached deceased with the gun across his arm and in a position to shoot deceased. Deceased was then sitting side ways on his horse, with his right leg thrown over the neck of his horse, his right elbow resting on that leg, and his head on his right hand—his body leaning a little forward. In that position he talked a few minutes to Crenshaw, who was standing on the ground by the side of McKinney's horse, holding his Winchester with both hands, and the muzzle pointing towards McKinney. McKinney's pistol was in the scabbard on his right hand side. He had nothing in his hands, and both hands were gloved. During this time witness and defendant were engaged in a conversation of some trivial character. Finally defendant, in a low tone of voice, asked witness for a chew of tobacco. Witness had his tobacco under his gloves and handkerchief in the right-hand pocket of his sack coat. While getting it out he heard Crenshaw ask McKinney: "What is the matter, Charley?" or perhaps McKinney asked Crenshaw: "What is the matter, Bud?" he was not certain which. About that time, the witness having at the moment succeeded in getting his tobacco from his pocket, the defendant repeated, in a loud tone of voice: "Give me a chew of tobacco, Pete!" Witness threw the tobacco to him, and at that instant heard the report of a gun fired at the point where Crenshaw and McKinney were. Witness looked that way instantly and saw McKinney falling from his horse, and Crenshaw presenting his gun at him, with the muzzle almost touching his chin. As McKinney fell, Crenshaw pushed the gun against his breast and fired again. When the witness turned to look at deceased and Crenshaw, exposing his left side to defendant, the defendant shot witness, the ball entering the lower part of the left shoulder blade, ranging upward and passing out through the top of the left shoulder, shattering the bone.

Upon receiving the shot described, the witness, who with difficulty maintained his seat on his horse, looked toward defendant and saw him in the act of firing on him a second time. The witness could not manage his horse, which ran off with him when the first shot was fired by defendant. One or two more shots were fired at witness as his horse fled, and a shot

was fired at him from inside the defendant's house. The last mentioned shot could not have been fired by either defendant or Crenshaw, because neither of them could have reached the house by that time. Witness saw no person about the said house other than defendant and Crenshaw, and could not imagine who fired the shot from the inside of the house. Seven or eight shots in all were fired, one of which passed through the left shoulder of the witness's coat. On reaching the immediate vicinity of the defendant's house. the witness saw two horses standing at and tied to the northeast corner of the house. Each of the horses had on a bridle and saddle, and there was a wallet or bundle secured to one of the saddles. Before reaching the defendant's house McKinney told witness that he was going to stop there and get Crenshaw to go to White's ranch with him and witness. Defendant and Crenshaw had their Winchester guns when witness first saw them in Twohig. Crenshaw was standing immediately by the side of McKinney's horse just before he fired the first shot. McKinney had a buckskin glove on each hand, and had no weapon of any kind in either hand when shot. When the witness was shot, his horse sprang toward Crenshaw, Crenshaw threw his gun down on witness, and at that instant defendant fired the second shot at witness. Witness saw the body of McKinney about an hour after he was killed, and was told at that time that McKinney was shot four times. Witness had not seen Crenshaw since the killing of McKinney. About three weeks before the killing of McKinney, the witness stepped into Butler's saloon in Cotulla, where he met defendant—defendant having sent for him. Defendant appeared to be very angry on that occasion, and denounced McKinney to the witness as a "damned son of bitch." This remark about McKinney, who was a friend of the witness, inflamed the witness, and he made some denunciatory reply to defendant. One word brought on another, until defendant drew a pistol. Witness instantly drew his, when defendant subsided, and said something about fighting a duel, proposing, as witness understood him, that he and Crenshaw would fight a duel with witness and McKinney. He then said that if McKinney ever came to Twohig he had better get off the train shooting, or he would never leave there alive.

Cross examined, the witness said that sometime after the conversation in Butler's saloon, as detailed above, he met the defendant in the streets of Cotulla, when defendant undertook

to "smooth over" the matter by telling witness that he would not have said what he did in the saloon but that he was drunk. He was drinking somewhat at the time of that conversation. The witness knew as a matter of fact that defendant did not like McKinney. He could not say that McKinney had any particular grudge against the defendant, but he had said to witness that the defendant was a fool. McKinney had several times arrested defendant for being drunk and disorderly. He arrested him at Twohig once for being drunk and having a pistol, over which matter he and defendant had some trouble. Witness could not state how long the ill feeling between defendant and McKinney had existed before the killing. Defendant and McKinney sometimes spoke when they met, and sometimes they did not. Crenshaw and defendant lived near each other and spent much of their time together. Defendant knew where McKinney lived. He did not speak to McKinney, nor McKinney to him, on the day of the killing. When McKinney, sitting on his horse in the position heretofore stated by witness, called Crenshaw to him, he, Crenshaw, stepped forward, cocked his Winchester, and, the witness thought, then let the hammer down, and approached McKinney with the Winchester in a position to shoot. McKinney could see all that Crenshaw did, but neither he nor witness said anything. Defendant was looking towards witness when he asked witness, the second time, in the loud tone of voice for the chew of tobacco. Just before witness threw the tobacco to defendant, he heard Crenshaw's voice—or he took it to be Crenshaw's—say: "What is the matter, Charley?" and the shooting commenced. Judging from the circumstances, and the manner in which defendant last asked for the tobacco, it was the witness's solemn belief that the defendant's said request to witness was the signal to Crenshaw to shoot McKinney. Crenshaw fired the first shot, killing McKinney, and almost simultaneously defendant fired the shot that wounded witness. Witness did not see either Crenshaw or defendant when the shot was fired from the house. The said shot came from the south side of the house. Witness could not see into the house. He had never been in it, and knew nothing about its interior arrangement. He could say nothing about an opening, whether door, window or cracks, on the south side. The only opening he saw was on the west side, facing Twohig.

Further cross examined, the witness said that he was unable

now to state whether the conversation in Butler's saloon with defendant, as detailed on direct examination, occurred before . or after the election. George Gerdner, John Butler, Foster Cope, McMullen, George Salmon, Justice Howard and the bar tender were present at the time of that conversation. Justice Howard had since died. Defendant uttered no threats in the conversation he had with witness in Twohig, a few minutes before the killing. Benito Santos, who lived in the neighborhood of White's ranch, and who was going home, was going to pilot witness and McKinney to White's ranch. McKinney, witness and Santos were all armed, the latter with a Winchester. The wagon road from Twohig to White's ranch did not lead by defendant's house. A trail only led from Twohig to the said ranch, via defendant's house. The witness thought it strange that Crenshaw should cock his gun on starting to McKinney, but, as McKinney said nothing, he did not. He could not say that McKinney observed Crenshaw cock the gun. The witness could not say that he did or did not attempt to draw his pistol when Crenshaw fired the first shot. He did try to draw it immediately after he was shot by defendant. The witness testified on the examining trial of this defendant. He did not testify on that trial to the threats uttered by defendant in Butler's saloon because, having previously told the district attorney and Mr. Nott of those threats, they both advised him to withhold that part of his testimony for the final trial in the district court. Witness stated in his testimony on the examining trial that he did not suppose that defendant and McKinney loved each other. He also testified that he thought defendant's last request to him for tobacco was the signal for Crenshaw to shoot McKinney. When he gave that testimony defendant said to him, in the presence of the justice of the peace: "You are telling things to suit yourself any way; why don't you swear it?" Witness thereupon drew his pistol, called the defendant a damned son of a bitch, and charged him with "putting up the job by which Charley McKinney was murdered." The witness stated that the defendant was then in arrest, and that, for that reason he, witness, would like to be permitted to give a satisfactory explanation of his conduct on that occasion, the fact being that he drew his pistol more on account of old Jesse Laxon, the uncle of defendant, who, at the time, was sitting by the defendant, armed. The witness communicated to McKinney, before the fatal day, the threats uttered by defend-

ant in Butler's saloon. The killing of McKinney created a great deal of excitement in La Salle county, and had the defendant or Crenshaw fallen into the hands of some of the citizens they would undoubtedly have been lynched. They were, however, perfectly safe from lynching in the hands of the officers of the county. It was true that parties had been taken from jail in Cotulla and hung without judge, jury or trial, but in every such case they deserved hanging.

On re-examination, the witness was directed to detail, circumstantially, the episode in the examining trial, of which he had spoken. He stated that while he was on the stand on that trial and throughout the entire trial, Jesse Laxon, the reputed uncle of defendant, sat by defendant's side. The witness knew that Laxon was armed, because he saw his hand under his coat and on the handle of his pistol. He had not disarmed Laxon, because he knew Laxon to be a deputy sheriff of Dimmitt county, and authorized to carry a pistol. When the witness testified that he believed defendant gave the signal, as testified here, for Crenshaw to shoot McKinney, defendant said: "Why don't you swear it; you are telling things to suit yourself anyway?" The witness then distinctly saw Laxon partially raise up and attempt to draw his pistol. Witness did not propose to sit there unarmed, under the circumstances, and accordingly he drew his pistol on Laxon more than on defendant, and kept his eye on Laxon while he replied that defendant was the "damned son of a bitch who put up the job to murder Charley McKinney; that he, defendant, was and had always been a thief and an outlaw." Bill Johns and others caught witness, and Laxon left.

Dr. Bain testified, for the State, that on the morning of December 26, 1886, Mrs. Gallaway, who lived near Twohig Station in La Salle county, came for the witness to go to her house to make a surgical examination of her daughter, who, it was charged, had been recently ravished. The witness got on the train for Twohig on that day, and when near Twohig got in company with McKinney and Edwards, who told him they were en route to Mrs. White's ranch to arrest Dow White for the alleged rape of Miss Gallaway. When the train reached Twohig the witness saw the defendant, whom he knew, standing on the platform. Edwards and defendant met on the platform, spoke to each other and shook hands in a friendly manner. Within a short while the witness saw Crenshaw in town.

He and defendant got together, and shortly rode off together toward the defendant's house, which was situated about a quarter of a mile east of Twohig Station. As they crossed the railroad they passed Captain McKinney, who was then in conversation with Mr. Stewart. After reaching a point about twenty-five or thirty yards beyond McKinney, Crenshaw turned and rode back. As he started back, defendant said to him: "Come on, Bud." Crenshaw motioned his hand behind him at defendant, approached McKinney and said to him: "How are you, Charley?" McKinney replied: "How are you, Bud?" shook hands with him and asked him: "How did you spend Christmas?" Crenshaw replied: "I had a fine time; got drunk, but am sober now." After a few more words of conversation, Crenshaw turned and went back to defendant, and the two rode off towards the defendant's house. Both the defendant and Crenshaw had guns on their saddles.

Witness, McKinney and Edwards, after remaining in Twohig about three quarters of an hour. secured horses and got a Mexican named Santos as a guide, and started to the White ranch. Between the depot and defendant's house McKinney said that he was afraid that defendant and Crenshaw would warn White that he was being searched for, and that if he did not find White at defendant's house, he was going to add Crenshaw to his posse and take him along. McKinney and his party, including the witness, instead of taking the regular road to White's ranch from Twohig, took the path or trail that led by defendant's house. When the party reached a point within fifty or sixty yards of defendant's house, the witness observed defendant and Crenshaw walk from the west side of the house to the south side, whence they disappeared around the east side. McKinney's party was traveling east. A very few moments later the witness saw defendant and Crenshaw sitting down near together on the east side of the house, with their Winchester guns across their laps. McKinney said to witness: "You and Santos go on; I will overtake you presently." Witness and the Mexican rode on slowly. Edwards stopped near defendant. McKinney said to Crenshaw: "Bud, come here; I want to see you a minute," and rode to a point about thirty yards distant from defendant and Edwards. Witness, riding along slowly, observed Crenshaw and saw him get up, start towards McKinney with his gun grasped in both hands, the muzzle pointing towards McKinney. He cocked

his gun as he advanced, and took his position at the side of McKinney, with his gun in a position to shoot McKinney, which position he maintained until he did fire the fatal shot. McKinney was leaning forward, with his right elbow resting on his horse's neck, and his head resting on his right hand. His pistol was in the scabbard, belted around his body. He had gloves on his hands and had nothing in his hands. According to witness's recollection, both of McKinney's feet were in the stirrups. When witness and Santos reached a point about sixty yards distant from McKinney and Crenshaw, witness saw Crenshaw thrust the muzzle of his gun to McKinney's face or chin and fire at McKinney, who was maintaining the position described. Almost instantly another shot was fired about the place where the defendant was when witness last saw him, which place witness could not see at that moment, because of Edwards's horse. When this shot was fired, Edwards's horse whirled around, and at least one more shot was fired from the blanket on which defendant was sitting when witness last saw him. It was the second shot fired from the blanket, as indicated by the course of the wound and the movement of Edwards's body in the saddle, that struck Edwards. Witness saw a second shot fired into McKinney's body by Crenshaw, and afterwards saw four wounds in McKinney's dead body, either one of which was necessarily fatal. When witness, who left the scene immediately upon the firing of the shots described, reached Twohig, he found Edwards already arrived, wounded in the manner described by him (Edwards). The witness heard seven shots fired, four of which he saw. He did not hear anything said by McKinney or Crenshaw after McKinney called Crenshaw. He did not hear defendant ask Edwards for tobacco. He did not see McKinney either draw or attempt to draw a pistol. The witness saw two horses, saddled and bridled, at the northeast corner of defendant's house. They were the same horses ridden by defendant and Crenshaw in Twohig. McKinney's face and wrist were blackened by powder-burn.

On his cross examination the witness said that McKinney was killed by the first shot fired by Crenshaw. It was understood by the witness that if Dow White was not found at defendant's house, the party was to go on to White's ranch, taking Crenshaw along as a part of the posse. Witness and the Mexican rode forward when directed by McKinney to do so,

and had just checked their horses to wait when the first shot was fired. The witness saw but one opening to the defendant's house or "jacal," and that was on the west side, looking towards Twohig.

Benito Santos testified, for the State, that in December, 1886, he lived near the White ranch, in La Salle county, Texas. He met Captain McKinney and Mr. Edwards in Twohig on the evening of December 26, 1886, and was employed by them to guide them to the White ranch. Dr. Bains was with them. The witness saw the defendant and Bud Crenshaw, the latter of whom he had never seen before, in Twohig on the same evening. When McKinney's party, including witness, started from Twohig to White's ranch, they took the trail *via* defendant's house, which was the nearest route to the said ranch. The defendant's house stood about ten steps from that trail. When the party got within about one hundred yards of defendant's house, the witness saw the defendant going from the brush towards his house. He was alone and on foot,—walking on his crutch—and had no gun, and so far as the witness could tell, no pistol with him. Crenshaw was then on the east side of the house, where the defendant joined him. As the party came in view of defendant and Crenshaw on the east side of the house, the witness observed a carbine gun leaning against the house near them. About that time Captain McKinney told Dr. Bains and witness to ride on, and he and Edwards stopped. When witness and Dr. Bains had gone a short distance, witness looked back and saw Captain McKinney and Crenshaw talking to each other. Crenshaw was standing by the side of McKinney's horse, and McKinney was sitting on his horse in the position stated by the witness Edwards. He had a pair of buck-skin gloves on his hands, and in one hand held a small riding whip which the witness loaned him a few minutes before. He had nothing but the whip in his hands. The witness and Dr. Bains rode forward slowly, and when they had reached a point about seventy yards distant from the parties, witness heard defendant in a loud voice ask Edwards for a chew of tobacco. In an instant and almost simultaneously two shots were fired. Witness looked back and saw Captain McKinney falling from his horse, Crenshaw preparing to shoot again, defendant leaning against the house, and smoke ascending from the place where he stood. Crenshaw shot McKinney the second time as he fell off his horse, and twice after the body had

fallen. As the witness left the scene he saw Crenshaw and defendant disappear behind the house. He saw but one horse at the defendant's house, and that was the horse ridden by defendant from Twohig.

Cross examined, the witness said that the trail by defendant's house led into the White's ranch road through the brush. He did not hear Captain McKinney, when the party left Twohig, say that he would have to go by defendant's house. In approaching the said house over the said trail, the party rode in single file, Edwards in advance, McKinney next, Doctor Bains next, and witness in the rear. Witness thought that McKinney and Edwards could have seen defendant approaching the house from the brush as well or better than he could. The witness was positive that Crenshaw and defendant were not sitting on a blanket when he, witness, reached the house, and that defendant was standing on his crutch against the house, talking to Edwards, with no gun in his hands, when witness and Doctor Bains rode forward, as directed by McKinney.

W. Gallaway was the next witness for the State. He testiged that he lived in LaSalle county, about seven miles distant from Twohig station. He was not related to defendant, but had known him about eleven years. He could not say how long he had known Crenshaw when he, Crenshaw, was killed resisting arrest. When killed, Captain McKinney had just been elected sheriff of LaSalle county for the third term. Defendant used to divide his residence between the houses of the witness and John DeSpain. About the time of the general election in November, 1886, the defendant asked the witness to help him decoy and kill Captain McKinney. That proposition was made to witness by the defendant at defendant's house, in the presence and hearing of W. O. Tompkins and a Mexican named Fumicina Garcia. He had twice before made the same proposition to the witness, once during the term of the district court in Cotulla in 1885, and again about two weeks after the adjournment of that term of court. The witness at no time agreed to help him decoy or kill Captain McKinney, but, on the contrary, positively and absolutely refused. Witness saw the defendant at night, about two weeks after the killing of McKinney. He came to witness's house on that night to get some provisions. He was on horseback, and, witness supposed, was armed. Witness saw him again on the next day in the brush, about

three miles distant from witness's house. He was then lying
in the brush, waiting to be supplied with provisions. On that
occasion defendant told witness that he, defendant, shot Pete
(Edwards), and that Crenshaw shot McKinney, who fell off
his horse like a turkey gobbler. He assigned no reason for
shooting Edwards, nor did he say why Crenshaw killed McKin-
ney. Witness sent word to Captain Schmidt, of the Texas
ranger force, that defendant was in his, witness's, neighbor-
hood, and that he could arrest defendant by watching his, wit-
ness's, house.

Cross examined, the witness said that, when he saw defend-
ant at his house and when he took provisions to defendant in
the brush, he knew that defendant was accused of the murder
of Captain McKinney. The officers in Cotulla asked witness
to obtain information for them as to the whereabouts of de-
fendant, and he sent them word that they could find defendant
by watching his, witness's, house. The witness did not get
mad when defendant proposed the assassination of McKinney
to him. Witness and defendant had always been friends, un-
til the killing of McKinney, at which time the witness's feelings
towards defendant changed. He had always opposed Captain
McKinney in elections, but his feeling towards both McKinney
and defendant changed at the death of McKinney, from the
fact that McKinney lost his life in going to the defense of the
witness's family in the absence of the witness. White had
been charged with the rape of the witness's daughter, the wit-
ness being away from home at the time, and McKinney was
on his way to arrest White when he was killed. Witness was
about sixty miles away from home on the day that McKinney
was killed, and did not know of the killing nor of the rape of
his daughter until he got back home. The witness never told
McKinney of the propositions made to him by defendant to
kill him, McKinney. The reason why witness furnished food
and shelter to defendant after the killing of McKinney was
that he thought the defendant could furnish or suppress evi-
dence against Dow White for the rape of witness's daughter.
Witness attended the trial of Simpson DeSpain, in Frio county,
and remembered meeting Mr. Haltom (attorney for defendant)
at that trial, and remembered that he went to Haltom and in-
quired after *"mia compadre"*—meaning the defendant; and
that he told Haltom to tell defendant that he, witness, could
do nothing for him until after the trial of Dow White, when

he, witness, would go to his, defendant's, assistance. The wit-
ness sent that word to defendant by Haltom, to keep defend-
ant's people from working against him in the Dow White
case;—notwithstanding which fact, his people did help White.
White was in jail when witness took the food to defendant in
the brush. On that occasion the defendant told witness that
he had been hiding in Hill's pasture. He did not say where
Crenshaw then was, nor did he then or at any other time tell
witness that he signalled Crenshaw to shoot McKinney, by
asking Edwards for some tobacco. Witness first divulged the
facts to which he has now testified after the acquittal of Dow
White.

Mr. McInest testified, for the State, that he lived in Twohig
at the time of the tragedy, and heard the firing of the fatal
shots. He and Mr. George Knaggs reached defendant's house
about fifteen or twenty minutes later. They found McKin-
ney's body, with arms extended, lying on the ground about
thirty steps from the house. McKinney had his buckskin
gloves on, and his pistol was in the scabbard belted around his
body.

Captain George H. Schmidt testified, for the State, that he
was captain of a company of State troops in December, 1886.
On the twenty-eighth day of December, 1886, he was ordered to
La Salle county. He reached Cotulla on the twenty-ninth day
of that month, when Captain R. P. Fly, who had been ap-
pointed sheriff to succeed Captain McKinney, delivered to him
warrants for the arrest of Crenshaw and defendant. Witness
and five men raided the county several times in search of the
defendant and Crenshaw. About the middle of January,
1887, the witness learned that Crenshaw was in the Summers
pasture, and knew that defendant was not far away from
Crenshaw. He and his men accordingly waylaid a trail over
which witness presumed the parties would pass in quest of
water. After several days waiting, two men, who proved to
be Crenshaw and W. O. Tompkins, appeared on the trail in the
distance. Witness stationed his men in a manner to entrap
the parties. When they reached a certain point on the trail
witness stepped into the trail and ordered Crenshaw to surren-
der. Tompkins also called to him to surrender. Instead of
doing so, Crenshaw drew his pistol and fired, and was imme-
diately shot down by witness's men. Tompkins fled and Cren-
shaw soon died. The witness at that time knew where the

defendant was, but expected him at that particular hour to be with Crenshaw. Defendant afterwards surrendered, being brought in by his brother.

Cross examined, the witness said that after his surrender the defendant expressed great fear of being mobbed, but witness did not think he was as afraid of the people of Cotulla, as those people were of him. Great excitement prevailed in Cotulla. Mr. Hill was afterwards killed. Defendant's surrender was opportune as he could not have avoided capture. He knew the thickets better than his pursuers, but was hemmed in and worn out.

The State closed.

George Knaggs, postmaster at Twohig, was the first witness for the defense. He testified as McInest did about going to defendant's house after the shooting, and finding McKinney's body, and further that, as was his daily custom, defendant came to the post office on the fatal day just after the train passed through and asked for letters which the witness knew he had reason to expect by that mail. Defendant was at the depot when McKinney reached Twohig on that evening. It had always been defendant's custom since witness had known him, to carry a Winchester rifle or carbine. When he came to Twohig he generally left his gun in witness's store until leaving town. Witness did not remember seeing defendant with a gun on the fatal day. Defendant's house had but one opening —the door on the west side. The road to White's ranch did not pass defendant's house. Witness saw McKinney alone in Twohig several times after the election of 1886. Witness did not remember seeing defendant and Crenshaw together on the fatal day.

Willie Hill testified, for the defense, that the road from Twohig to White's ranch did not pass by defendant's house. A path led towards that road as far as defendant's house, but beyond that one would have to go through the brush to get to the said road.

Cross examined, the witness said that Bud Crenshaw was his uncle, and at the time McKinney was killed, lived at his, witness's, father's house. He left that house to go to Twohig, about three o'clock on the evening of the murder of McKinney. He came back to the house late that evening after the killing, defendant being with him. Defendant said that Crenshaw killed McKinney, but at that time said nothing about Edwards.

They remained at the house a very short while, and then left, as they came, on horse back, taking Winchesters and pistols with them. The witness afterwards, on one or two occasions, saw Crenshaw in the brush, on which occasions he told witness that he killed McKinney. Witness never saw defendant in the brush after the killing. Witness did not tell the officers that they could find Crenshaw in the brush. He did not consider the arrest of Crenshaw any business of his, and so far as he was concerned, he decided to let the officers find Crenshaw if they could.

*A. J. Evans* and *Ed. Haltom*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

Hurt, Judge. This is a conviction for murder of the first degree, with the death penalty.

At the May term, 1887, of the district court of La Salle county, appellant was indicted for the murder of C. B. McKinney. On the thirteenth day of May, 1887, the court of its own motion made an order, changing the venue of the case to the district court of Bexar county. When this order was made, appellant objected to the case being sent to Bexar, that county being out of that judicial district. The learned judge filed reasons for sending the case out of his district; which reasons are quite satisfactory. (See art. 576, Code Crim Proc.)

On the trial the State, over objection, proved by S. V. Edwards that, about two or three weeks before McKinney was killed, defendant McCoy told the witness, in the presence of others, in Butler's saloon, in Cotulla, La Salle county, that if C. B. McKinney ever came to Twohig he had better come shooting, as he intended to kill him, etc. Counsel for appellant objected because these threats did not tend to prove appellant a principal actor in the murder of McKinney, or to show a conspiracy with Bud Crenshaw to kill him, the fact being that Crenshaw was the actual perpetrator of the crime.

Appellant was present when Crenshaw killed deceased, and these threats were introduced as cogent facts in corroboration of the attending circumstances which established that there was not only a conspiracy to murder deceased, but also that Crenshaw and appellant acted in concert in the killing of McKinney. These observations apply to the competency of the

testimony of the witness Gallaway. That Gallaway was an accessory is no objection to the competency of this testimony.

Upon cross examination of the witness Gallaway, counsel for appellant asked him: "Were you not a witness in behalf of Simpson De Spain, a nephew of the defendant, when De Spain was tried for murdering a Mexican, and did you not voluntarily testify in behalf of De Spain; and, after you charged Dow White with raping your daughter, did you not endeavor to get this defendant, Jim McCoy, to procure false testimony against said Dow White, which he refused to do?" Counsel for the State objected because of irrelevancy. The objection was sustained and appellant reserved a bill.

" A witness can not ward off answering a question *material to the issue* on the ground that it imputes disgrace to himself, if such disgrace does not amount to crimination." This is the doctrine as stated by Wharton. (Crim. Ev., sec., 473.) "A witness may, upon cross examination, be asked whether he has been in jail, in the penitentiary, or State prison, or any other that would tend to impair his credibility." The facts proposed to be proved by this witness not being material to any issue in the case, the court acted properly in excluding them.

When Edwards related the threats, etc., made by the appellant, his counsel moved to postpone the trial because surprised by this testimony. It appears that Edwards had testified before the examining court, but had not mentioned these threats. He states that these threats were made in the presence of several persons; naming them. The threats were that in the presence of Foster Cope, Geo. Salmon and Tom Gerdner, at Cotulla, defendant told the witness Edwards that if McKinney ever came to Cotulla he had better get off the train shooting or he would never get away alive. In this there is no threat in *terms* to kill deceased.

Now appellant moved to postpone to procure the attendance of Cope, Salmon and Gerdner to prove that they "were never present at the time when he, defendant, threatened to *kill* deceased, or said if he, deceased, ever came to *Twohig* he had better get off the train shooting." Edwards swears that defendant said if McKinney came to Cotulla, etc. Appellant swears that he could prove by Cope, Salmon and Gerdner that defendant never said that if McKinney came to Twohig, etc. Edwards did not swear that defendant stated to him that if

McKinney should come to Twohig he had better get off the train shooting. Hence what appellant proposed to prove by Cope, Salmon and Gerdner might be true and still Edwards would not be contradicted or impeached in any manner. There was no error in refusing to postpone.

The court did not err in refusing to charge the law of murder of the second degree. Crenshaw killed McKinney, and if appellant is criminally responsible at all for the homicide, the grade of the offense under the facts is not short of murder of the first degree.

At the request of appellant the court gave this charge to the jury:

"The defendant asks the court to charge the jury that before you are authorized to find defendant guilty, you must believe from the evidence, and the evidence alone, and beyond a reasonable doubt, that the defendant either shot and killed the deceased, C. B. McKinney, or was present acting with some one else in the killing of McKinney. Therefore, if you find from the evidence that one Bud Crenshaw shot and killed C. B. McKinney, and that such killing was with express malice as defined in the general charge, and that immediately afterwards the defendant shot at, and shot, S. V. Edwards, and that this was the same time and place of the shooting of deceased, McKinney, and that the defendant did not shoot at C. B. McKinney, or offer any violence towards the deceased, then, before you would be authorized to find this defendant guilty, you must believe from the evidence, beyond a reasonable doubt, either that this defendant and Bud Crenshaw had previously entered into an agreement to kill the deceased, C. B. McKinney, and the deceased was killed in pursuance of such agreement, while the defendant was there present, or that Bud Crenshaw shot and killed McKinney, and that the acts of the defendant were enacted for the purpose of aiding or abetting the said Crenshaw in the killing of said McKinney. And if you should find from the evidence that one Bud Crenshaw shot and killed the deceased, and that all that was then done by the defendant was to shoot S. V. Edwards, then before you could find this defendant guilty you must find from the evidence, beyond a reasonable doubt, that the shooting of Edwards was done for the purpose of aiding or abetting said Crenshaw in the killing

28

of C. B. McKinney, before you would be authorized to find the defendant guilty.

"J. M. ECKFORD,
"TEEL & HALTOM.

"The foregoing charge is given in subordination to the general charge regarding principals.

GEO. H. NOONAN,
"*Judge.*"

There was no objection at the time to the qualification, viz: "The foregoing charge is given in subordination to the general charge regarding principals,"—the objection being urged first on the motion for a new trial. This being the case, was the qualification calculated to prejudice the case of appellant?

In passing upon the question of injury *vel non*, or probable injury resulting from a positive error or omission in the charge, the whole record must be looked to: 1. The charge as a whole; 2. The statement of facts. The learned judge, in the charge already given, had clearly and concisely hinged appellant's guilt upon the fact as to whether he was present and, knowing the unlawful intent of Crenshaw, aided and encouraged him in the killing, or whether the appellant had advised or agreed to the offense and was present when the same was committed.

Appellant's requested charge, above, is predicated upon the theory that Crenshaw shot and killed McKinney, unaided by him in any manner. That the killing of McKinney was a distinct transaction from that between appellant and Edwards ; that, if this theory of the case is not shown to be true, it is left in doubt, and should have been submitted to the jury in a clear, simple and affirmative charge, without qualification, or being subordinate to any other charge. This is a strong position and if sustained by the evidence, or the weakness of the State's case, should be ground for a reversal of the judgment.

As Crenshaw killed McKinney, it devolved upon the prosecution to prove beyond a reasonable doubt: 1, that Crenshaw and appellant acted together in the killing of McKinney; or, 2, that appellant was present; that he knew of the purpose of Crenshaw to kill deceased, and with this knowledge he aided

by acts or encouraged by words or gestures Crenshaw in the commission of the murder; or, 3, that Crenshaw and appellant had agreed with each other to kill McKinney, and that appellant was present when Crenshaw shot and killed the deceased.   To convict, one of these propositions must be shown beyond a reasonable doubt, and if from the weakness of the testimony relied upon to establish these propositions there is a shade of doubt as to the existence of the one most strongly supported by the State's testimony, then there might have been injury to the rights of appellant by the qualification appended to the charge under discussion.   We must therefore look to the facts.

Looking to the facts bearing upon this question, the most shadowy, gauzy veil of a doubt does not remain.  Our judgment is perfectly clear and satisfied beyond any sort of doubt or misgiving as to the truth of each of the propositions, namely: that the appellant and Crenshaw acted together in the murder of C. B. McKinney; that it was thoroughly agreed between them before the deceased and Edwards reached appellant's house that McKinney should be killed.   Each knew minutely the part to be performed by him, and executed it with precision and fatally to deceased.

. Under this state of case, if the learned judge had refused to submit to the jury the requested instructions (those given with qualification), in the absence of exceptions for the omission or refusal, we would not be warranted in reversing the judgment. Other objections were made to the charge in the motion for new trial, but we are of opinion that none are well taken.

If correct in the above observations as to the facts of this case, it is unnecessary for us to discuss the sufficiency of the evidence to support the conviction.

Appellant has been awarded a just, cautious and fair trial. His triers have convicted him of one of the most heinous crimes known to our laws, inflicting upon him the most terrible punishment.   While this is true, a moment's reflection, carrying him back to the scene of the deliberate, bloody assassination of C. B. McKinney, will convince him that he is the author of his present calamities and fearful doom.

Finding no error in the judgment, it is affirmed.

*Affirmed.*

Opinion delivered February 20, 1889.

## ON MOTION FOR REHEARING.

HURT, JUDGE.  The only ground upon which this motion is based and urged in the able oral argument of counsel for appellant is a supposed error into which we have fallen with regard to appellant's motion at the trial for a postponement of the same to enable him to procure the attendance of witnesses to contradict the witness Edwards as to threats made by appellant against the deceased.  We discussed the subject from the statement in the bill of exceptions itself.  The bill of exceptions states that the threat or supposed threat was to be executed when McKinney, the deceased, should get off the cars at Cotulla.  It is urged that a clerical mistake has occurred in preparing the bill, and that in fact Twohig, and not Cotulla, was the place named by the witness Edwards, and we are referred to other portions of the record in substantiation of this assertion.  We are satisfied upon a re-examination of the record that the mistake in the names of the two places has occurred as stated—that Twohig must have been the place stated by the witness.

But, conceding this to be true, the sole object of the proposed testimony was to contradict the witness as to threats made by appellant against the deceased at the time and place mentioned. Suppose that evidence had been adduced, or that it could be adduced on another trial, is it at all likely or probable that it could or should have any effect in changing the result?  This is the question, and the only pertinent question, as the matter is now presented to us.

Viewed in the light of other testimony at the trial, we think the proposed testimony could have had no possible weight in changing the result.  The witness Gallaway testified most positively, locating time, place and parties present, not only to threats made by appellant against McKinney, but to the fact that appellant tried to get him, witness, to aid and assist him in the killing.  These threats, according to that witness, were made more than once.  This witness's testimony is not contradicted or attempted to be contradicted by Tompkins or Garcia, the parties stated by him to be present at the time these threats were made.  If it was necessary to prove previous threats on the part of defendant, then this witness's testimony abundantly proves threats of a more hostile character than those testified to by the witness Edwards.  How, then, could the dis-

proving of Edwards's statement affect the uncontradicted statement of Gallaway that defendant made the threats about which he testifies? We are clearly of opinion that the proposed testimony could not affect the result of another trial on account of this matter of threats.

We have found no reason, upon a mature reconsideration of this record, why our former affirmance of the judgment should be set aside, and the motion for rehearing is, therefore, overruled.

*Motion overruled.*

Opinion on the motion delivered March 23, 1889.